## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

**SALLY CANNON DUNLOP**, and **ADAM BUDD**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**BAYHEALTH MEDICAL CENTER, INC.,**

Defendant.

No. 24-0946 GBW

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

Sally Cannon Dunlop and Adam Budd ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Bayhealth Medical Center, Inc. ("Bayhealth" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.      This class action arises from Defendant's failure to protect highly sensitive data.

2.      Defendant is a healthcare system based in Dover, Delaware.[1]

3.      As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about its current and former patients. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

---

[1] *About Us*, BAYHEALTH, https://www.bayhealth.org/about-us (last visited August 9, 2024).

4.    It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former patients' PII/PHI.

5.    On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendant's failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

6.    Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

7.    The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former patients' private information was exactly that— private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

8.    Plaintiff, Sally Cannon Dunlop, is a natural person and citizen of Delaware. She resides in Dagsboro, Delaware where she intends to remain.

9.    Plaintiff, Adam Budd, is a natural person and citizen of Delaware. He resides in Milford, Delaware where he intends to remain.

10.    Defendant, Bayhealth Medical Center, Inc., is a corporation incorporated in Delaware and with its principal place of business at 640 South State Street, Dover, Delaware 19901.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states than Defendant. And there are over 100 putative Class members.

12.     This Court has personal jurisdiction over Defendant because it is headquartered in Delaware, regularly conducts business in Delaware, and has sufficient minimum contacts in Delaware.

13.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Defendant Collected and Stored the PII/PHI of Plaintiffs and the Class***

14.     Defendant is a healthcare system based in Dover, Delaware.[2]

15.     As part of its business, Defendant receives and maintains the PII/PHI of thousands of its current and former patients.

16.     In collecting and maintaining the PII/PHI, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class members themselves took reasonable steps to secure their PII/PHI.

17.     Under state and federal law, businesses like Defendant have duties to protect its current and former patients' PII/PHI and to notify them about breaches.

---

[2] *About Us*, BAYHEALTH, https://www.bayhealth.org/about-us (last visited August 9, 2024).

18.     Defendant recognizes these duties and guarantees its patients the following "rights" on its "Patients' Rights" webpage:

a.      "To security, personal privacy and confidentiality of your information."[3]

b.      "To expect that all communication and records pertaining to your care will be treated as confidential by Bayhealth and all employees, unless you have given permission for release of information, or reporting is permitted or required by law."[4]

c.      "To expect only the individuals directly involved in your treatment, individuals with responsibility for monitoring the quality of care, or individuals authorized by law or regulations to have access to your medical record."[5]

19.     Furthermore, in its "Notice of Privacy Practices," Defendant advertises the following:

a.      "This notice describes how medical information about you may be used and disclosed[.]"[6]

b.      We will not disclose your confidential communications with a physician or licensed mental health practitioner about your mental health diagnosis or treatment without your permission, unless that disclosure is necessary to

---

[3] *Patient's Rights & Responsibilities*, BAYHEALTH (October 19, 2021)
https://www.bayhealth.org/rights-and-responsibilities-privacy-policy.
[4] *Id*.
[5] *Id*.
[6] *Notice of Privacy Practices*, BAYHEALTH (October 21, 2021) https://www.bayhealth.org/rights-and-responsibilities-privacy-policy.

prevent imminent harm, further your interest in treatment, or we are permitted or required to do so by law."[7]

c.    "[W]e do not share your information unless you give us permission or we are permitted to do so by law."[8]

d.    "We are required by law to maintain the privacy and security of your protected health information."[9]

e.    "We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[10]

f.    "We must follow the duties and privacy practices described in this notice and give you a copy of it."[11]

g.    "We will not use or share your information other than as described here unless you tell us we can in writing."[12]

***Defendant's Data Breach***

20.    On or before July 31, 2024, Defendant was hacked in the Data Breach.[13]

21.    On August 3, 2024, Defendant admitted the following on its Facebook page:

a.    "On July 31, 2024, Bayhealth identified unusual activity on certain computer systems in the network."[14]

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] Bayhealth, *System Downtime Update*, FACEBOOK (Aug. 3, 2024)
https://www.facebook.com/photo/?fbid=1039609197724315&set=a.782410000110904.
[14] *Id*

b.     "We promptly took proactive measures to contain the activity and implemented our incident response process – a cybersecurity firm was also engaged to assist."[15]

c.     "The proactive measures we've taken means that we're experiencing connection issues with MyChart. If you or a loved one needs to communicate with a clinician or practice, please call their office."[16]

22.     Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendant's custody and control. And upon information and belief, the putative class is well over one hundred members—as it includes its current and former patients.

23.     Thus far, Defendant has not provided official notice to any Class Members. Thus, Defendant has kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

24.     Defendant failed in its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Defendant caused widespread injury and monetary damages.

25.     On information and belief, Defendant failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

---

[15] *Id*.
[16] *Id*.

26.    Because of Defendant's Data Breach, the sensitive PII/PHI of Plaintiffs and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class members.

27.    Stunningly, this Data Breach is only part and parcel of Defendant's **pattern of negligent data security**. After all, in April 2023, Defendant experienced another data breach which resulted in the "unauthorized access" to patient data.[17]

28.    Worryingly, numerous third-party reports have revealed that the cybercriminals that obtained Plaintiffs' and Class members' PII/PHI were the notorious cybercriminal group "Rhysida."[18]

29.    In fact, the CEO of Bayhealth has seemingly confirmed these reported—having declared in an official statement that "[o]n August 7, we were made aware that a third party claimed to have **taken and posted** Bayhealth data."[19]

30.    Rhysida is an especially notorious cybercriminal group. In fact, the Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA) released a joint report warning the public about Rhysida.[20] Specifically, the joint "Cybersecurity Advisory" (CSA) stated, *inter alia*, that:

---

[17] *Notice of Security Incident*, DELAWARE DEPT JUSTICE (Nov. 13, 2023) https://attorneygeneral.delaware.gov/wp-content/uploads/sites/50/2024/02/Bayhealth-Medical-Center.pdf.

[18] Laura Dyrda, *Bayhealth reports cybersecurity issue, hackers demand $1.4M*, BECKER'S HEALTH IT (August 8, 2024) https://www.beckershospitalreview.com/cybersecurity/bayhealth-reports-cybersecurity-issue-hackers-demand-1-4m.html.

[19] *Id*. (emphasis added).

[20] *#StopRansomware: Rhysida Ransomware*, FBI & CISA (Nov. 15, 2023) https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-319a.

a. "Rhysida—an emerging ransomware variant—has predominately been deployed against the education, healthcare, manufacturing, information technology, and government sectors since May 2023."[21]

b. "Rhysida actors have been observed leveraging external-facing remote services to initially access and persist within a network. Remote services, such as virtual private networks (VPNs), allow users to connect to internal enterprise network resources from external locations. Rhysida actors have commonly been observed authenticating to internal VPN access points with compromised valid credentials notably due to organizations lacking MFA enabled by default."[22]

c. "Rhysida actors reportedly engage in 'double extortion'—demanding a ransom payment to decrypt victim data and threatening to publish the sensitive exfiltrated data unless the ransom is paid."[23]

31. Indeed, Rhysida is notorious for publishing stolen PII/PHI on the Dark Web. For example, in December 2023, Rhysida hacked the company "Insomniac Games" and then *published* 1.67 terabytes—i.e., over 1.3 million files—onto the Dark Web.[24] Therein, Rhysida published the following types of employees' sensitive information:

a. non-disclosure agreements;

b. internal communications on Slack;

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Nicole Carpenter, *The catastrophe of the Insomniac hack goes way beyond leaked games*, POLYGON (Dec. 20, 2023, 2:24 pm EST) https://www.polygon.com/24009631/insomniac-games-leak-hack-rhysida-files-breach.

      c.      internal HR documents;

      d.      internal investigations and disciplinary reports;

      e.      recorded videos of meetings; and

      f.      scanned employee passports.[25]

32. Here, Rhysida has demanded a ransom of 25 Bitcoin (approximately $1,400,000) to be paid by August 14, 2024.[26]

33. Worse yet, Rhysida has **_already published_** scans of patients' passports, Social Security card numbers, and other sensitive employee documents.[27] A scan of the published data on Rhysida's Dark Web page is reproduced below (however, it is heavily blurred and redacted to protect victims' privacy).[28]

---

[25] *Id*.

[26] *Id*.

[27] Hackmanac, *Cyberattack*, LINKEDIN (August 7, 2024), https://www.linkedin.com/posts/hackmanac_cyberattack-usa-ransomware-activity-7227012404616790017-flZ_/?utm_source=share&utm_medium=member_desktop.

[28] HackManac (@H4ckManac), TWITTER (Aug. 7, 2024, 1:05 PM) https://x.com/H4ckManac/status/1821246334520709178/photo/1.



34.    Thus, on information and belief, Plaintiff's and the Class's stolen PII/PHI has already been published—or will be published imminently—by Rhysida on the Dark Web.

***Plaintiff Sally Cannon Dunlop's Experiences and Injuries***

35.    Plaintiff Sally Cannon Dunlop is a current patient of Defendant.

36.    Thus, Defendant obtained and maintained Dunlop's PII/PHI.

37.    As a result, Dunlop was injured by Defendant's Data Breach when her PII/PHI was exposed and stolen by Rhysida. Specifically:

      a.    In early August 2024, Dunlop discovered that her PII/PHI—including her email and Social Security number—were found ***published*** on the Dark Web.

      b.    Upon information and belief, this exposure is directly traceable to Defendant's Data Breach and the theft of her PII/PHI by Rhysida.

38.     As a condition of receiving medical services, Dunlop provided Defendant with her PII/PHI. Defendant used that PII/PHI to facilitate its provision of services and to collect payment.

39.     Dunlop provided her PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Dunlop's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

40.     Dunlop reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

41.     Thus, on information and belief, Dunlop's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

42.     Dunlop has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft.

43.     Dunlop fears for her personal financial security and worries about what information was exposed in the Data Breach.

44.     Because of Defendant's Data Breach, Dunlop has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Dunlop's injuries are precisely the type of injuries that the law contemplates and addresses.

45.     Dunlop suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

46.     Dunlop suffered actual injury in the form of damages to and diminution in the value of her PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

47.     Dunlop suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed her PII/PHI right in the hands of criminals.

48.     Because of the Data Breach, Dunlop anticipates spending considerable amounts of time and money to try and mitigate her injuries.

49.     Today, Dunlop has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Adam Budd's Experiences and Injuries***

50.     Plaintiff Adam Budd is a current patient of Defendant and received services at its Sussex campus in 2023. His PHI/PII was and continues to be stored and maintained by Defendant.

51.     Plaintiff Budd values his privacy and makes every effort to keep his personal information private. He diligently maintains his PHI/PII. He has never had his PHI stolen in the past.

52.     As a condition of receiving medical services, Plaintiff Budd provided Defendant with his PII/PHI. Defendant used that PII/PHI to facilitate its provision of services and to collect payment.

53.     Plaintiff Budd only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant was obligated to and would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information.

54.     Plaintiff Budd reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII/PHI.

55.    Plaintiff Budd has been injured in a number of ways, including by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Budd was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals.

56.    As a result of the Data breach, Plaintiff Budd has stepped up his efforts to protect his Private Information, including by updating and checking credit monitoring services, adding alerts to his accounts, and placing a freeze on his credit such that neither he nor anyone else can seek new credit debts. The Data Breach has detrimentally impacted his life as a whole, and specifically caused financial strain on him as a direct result of the Data Breach.

57.    On information and belief, Plaintiff Budd's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

58.    In addition, he has experienced an increase in spam emails, calls and text messages as a result of the Data Breach, many of which are actively seeking to steal money and information from him.

59.    Plaintiff Budd has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

60.    Plaintiff Budd fears for his personal financial security and worries about what information was exposed in the Data Breach.

61.    The present and substantial risk of imminent harm and loss of privacy have both caused Plaintiff Budd to suffer stress, fear, and anxiety.

62.    Plaintiff Budd's injuries are precisely the type of injuries that the law contemplates and addresses.

63.     Plaintiff Budd suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

64.     Plaintiff Budd suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed his PII/PHI right in the hands of criminals.

65.     Because of the Data Breach, Plaintiff Budd anticipates spending considerable amounts of time and money to try and mitigate his injuries.

66.     Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

67.     Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

    a.     loss of the opportunity to control how their PII/PHI is used;

    b.     diminution in value of their PII/PHI;

    c.     compromise and continuing publication of their PII/PHI;

    d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.    delay in receipt of tax refund monies;

g.    unauthorized use of their stolen PII/PHI; and

h.    continued risk to their PII/PHI—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII/PHI.

68.    Stolen PII/PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII/PHI can be worth up to $1,000.00 depending on the type of information obtained.

69.    The value of Plaintiffs and Class's PII/PHI on the black market is considerable. Stolen PII/PHI trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

70.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII/PHI far and wide.

71.    One way that criminals profit from stolen PII/PHI is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII/PHI, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

72.    The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

73.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators

and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

74.    Defendant disclosed the PII/PHI of Plaintiffs and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII/PHI of Plaintiffs and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII/PHI.

75.    Defendant's failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

76.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

77.    In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[29] Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[30] Those 330 reported breaches exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that

---

[29] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.
[30] *Id.*

exposed nearly 10 million sensitive records (9,700,238) in 2020.[31]

78.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[32]

79.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[33]

80.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

81.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

82.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[34]  The FTC declared that, *inter alia*, businesses must:

---

[31] *Id.*

[32] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[33] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Sept. 11, 2023).

[34] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

     a.     protect the personal customer information that they keep;

     b.     properly dispose of personal information that is no longer needed;

     c.     encrypt information stored on computer networks;

     d.     understand their network's vulnerabilities; and

     e.     implement policies to correct security problems.

83.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

84.    Furthermore, the FTC explains that companies must:

     a.     not maintain information longer than is needed to authorize a transaction;

     b.     limit access to sensitive data;

     c.     require complex passwords to be used on networks;

     d.     use industry-tested methods for security;

     e.     monitor for suspicious activity on the network; and

     f.     verify that third-party service providers use reasonable security measures.

85.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

86.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

*Defendant Failed to Follow Industry Standards*

87.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

88.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

89.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

*Defendant Violated HIPAA*

91.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly

known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[35]

92.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[36]

93.    The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

    a.    failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

    b.    failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

    c.    failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

---

[35] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[36] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

d.      failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.      failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.      failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.      failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.      failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.      failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

94.    Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

95.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3),

21

individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach discovered by Bayhealth in July 2024, including all those individuals who received notice of the breach.

96. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

97. Plaintiffs reserve the right to amend the class definition.

98. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

99. <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

100. <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes thousands of members.

101. <u>Typicality</u>. Plaintiffs' claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

102. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

103.  <u>Commonality and Predominance</u>. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

   a.   if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII/PHI;

   b.   if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

   c.   if Defendant were negligent in maintaining, protecting, and securing PII/PHI;

   d.   if Defendant breached contract promises to safeguard Plaintiffs and the Class's PII/PHI;

   e.   if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

   f.   if Defendant's Breach Notice was reasonable;

   g.   if the Data Breach caused Plaintiffs and the Class injuries;

   h.   what the proper damages measure is; and

   i.   if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

104.  <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to

the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

105.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

106.    Plaintiffs and the Class (or their third-party agents) entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

107.    Defendant owed a duty of care to Plaintiffs and Class members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

108.    Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

109.    Defendant owed these duties to Plaintiffs and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew

or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class members' PII/PHI.

110.    Defendant owed—to Plaintiffs and Class members—at least the following duties to:

a.    exercise reasonable care in handling and using the PII/PHI in its care and custody;

b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access;

d.    notify Plaintiffs and Class members within a reasonable timeframe of any breach to the security of their PII/PHI.

111.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

112.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

113.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

114.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

115.    The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

116.    PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiffs and Class members' and the importance of exercising reasonable care in handling it.

117.    Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

118.    Defendant breached these duties as evidenced by the Data Breach.

119.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class members' PII/PHI by:

a.    disclosing and providing access to this information to third parties and

b.    failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

120.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal

information and PII/PHI of Plaintiffs and Class members which actually and proximately caused the Data Breach and Plaintiffs and Class members' injury.

121.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class members' injuries-in-fact.

122.    Defendant has admitted that the PII/PHI of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

123.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

124.    And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

125.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiffs and the Class)

126.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

127.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PII/PHI.

128.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class members' sensitive PII/PHI.

129.    Defendant breached its respective duties to Plaintiffs and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI.

130.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

131.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

132.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class members would not have been injured.

133.    The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

134.    Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class members' PHI.

135.    Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

136.    Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

137.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

138.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

139.    Plaintiffs and Class members either directly contracted with Defendant or Plaintiffs and Class members were the third-party beneficiaries of contracts with Defendant.

140.    Plaintiffs and Class members (or their third-party agents) were required to provide their PII/PHI to Defendant as a condition of receiving medical services provided by Defendant.

Plaintiffs and Class members (or their third-party agents) provided their PII/PHI to Defendant or its third-party agents in exchange for Defendant's medical services.

141.    Plaintiffs and Class members (or their third-party agents) reasonably understood that a portion of the funds they paid Defendant would be used to pay for adequate cybersecurity measures.

142.    Plaintiffs and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

143.    Plaintiffs and the Class members (or their third-party agents) accepted Defendant's offers by disclosing their PII/PHI to Defendant or its third-party agents in exchange for medical services.

144.    In turn, and through internal policies, Defendant agreed to protect and not disclose the PII/PHI to unauthorized persons.

145.    In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Member's PII/PHI.

146.    Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

147.    After all, Plaintiffs and Class members (or their third-party agents) would not have entrusted their PII/PHI to Defendant (or their third-party agents) in the absence of such an agreement with Defendant.

148.    Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

149.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

150.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

151.    Defendant materially breached the contracts it entered with Plaintiffs and Class members (or their third-party agents) by:

a.      failing to safeguard their information;

b.      failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.      failing to comply with industry standards;

d.      failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.      failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendant created, received, maintained, and transmitted.

152.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

153.    Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

154.    And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

155.    Plaintiffs and Class members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

### FOURTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiffs and the Class)

156.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

157.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

158.    Defendant owed a duty to its current and former patients, including Plaintiffs and the Class, to keep this information confidential.

159.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class members' PII/PHI is highly offensive to a reasonable person.

160.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

161.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

162.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

163.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

164.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

165.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII/PHI of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

166.    And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

167.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI are still maintained by Defendant with their inadequate cybersecurity system and policies.

168.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for

monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiffs and the Class.

169.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

170.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

171.    This claim is pleaded in the alternative to the breach of implied contract claim.

172.    Plaintiffs and Class members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from (1) their payment, and (2) using their PII/PHI to facilitate its provision of medical services and to collect payment.

173.    Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class members (or their third-party agents).

174.    Plaintiffs and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

175.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class members' PII/PHI.

176.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations

at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

177.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class members' PII/PHI and payment because Defendant failed to adequately protect their PII/PHI.

178.    Plaintiffs and Class members have no adequate remedy at law.

179.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

180.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

181.    Given the relationship between Defendant and Plaintiffs and Class members, where Defendant became guardian of Plaintiffs' and Class members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiffs and Class members, (1) for the safeguarding of Plaintiffs and Class members' PII/PHI; (2) to timely notify Plaintiffs and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

182.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

183.    Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

184.    Defendant breached its fiduciary duties to Plaintiffs and Class members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class members' PII/PHI.

185.    Defendant also breached its fiduciary duties to Plaintiffs and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

186.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>**SEVENTH CAUSE OF ACTION**</u>
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

187.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

188.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

189.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

190.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b.    Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d.    Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class members.

191.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

192.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

193.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages— while warranted for out-of-pocket damages and other legally quantifiable and provable damages— cannot cover the full extent of Plaintiffs and Class members' injuries.

194.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

195.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing them counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Date: August 28, 2024

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Dean R. Roland*
Dean R. Roland (No. 6459)
R. Grant Dick IV (No. 5123)
The Brandywine Building
1000 North West St., Suite 1500
P.O. Box 1680
Wilmington, DE 19899-1680
(302) 984-3816
droland@coochtaylor.com
gdick@coochtaylor.com

Raina C. Borrelli (*pro hac vice*)
Cassandra Miller (*pro hac vice*)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com
cmiller@straussborrelli.com

Kenneth J. Grunfeld, Esq.*
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
grunfeld@kolawyers.com


*Pro hac vice forthcoming*

*Attorneys for Plaintiffs and Proposed Class*